# STATE OF MICHIGAN

# COURT OF APPEALS

PEOPLE OF THE STATE OF MICHIGAN,

        Plaintiff-Appellee,

v

CHARLES WILLIAM CONFERE,

        Defendant-Appellant.

UNPUBLISHED
August 10, 2017

No. 331619
Macomb Circuit Court
LC No. 2015-001318-FH

Before: GLEICHER, P.J., and M. J. KELLY and SHAPIRO, JJ.

GLEICHER, J. (*concurring*).

I concur with the majority's determination that prosecutorial misconduct resulted in prejudice that seriously affected the fairness, integrity, and public reputation of the proceedings. The conduct forcefully and fittingly condemned by the majority exacerbated unfair prejudice created by the improper admission of the character evidence that permeated the prosecution's proofs. I would reverse Confere's conviction on both grounds.

## I. IMPROPER CHARACTER EVIDENCE

Over Confere's objection, the trial court permitted the prosecutor to elicit testimony regarding three prior acts: a sexual assault that occurred 30 years ago involving a 14-year-old girl with cerebral palsy, and two assaults committed on an adult woman who lived in defendant's apartment building and walked with a cane. Had we not reversed Confere's conviction on prosecutorial misconduct grounds, I would have voted to reverse it based on the improper admission of this evidence.

Evidence of a defendant's past misdeeds is generally inadmissible when offered to prove the defendant's "inclination to wrongdoing in general," and his guilt of the charged offense in particular. *People v VanderVliet*, 444 Mich 52, 63; 508 NW2d 114 (1993). MRE 404(b) "does not prohibit all evidence of other acts that risks this character-to-conduct inference." *People v Jackson*, 498 Mich 246, 259; 869 NW2d 253 (2015). Rather, MRE 404(b)(1) permits the introduction of evidence of other crimes, wrongs, or acts to prove other relevant considerations, such as "scheme, plan, or system in doing an act," and "absence of mistake or accident when the same is material." Identifying a proper purpose is only half the battle, however. "[I]n order to determine whether an articulated purpose is, in fact, merely a front for the improper admission of other-acts evidence, the trial court must closely scrutinize the logical relevance of the evidence

-1-

under the second prong of the *VanderVliet* test." *People v Denson*, __ Mich __; __ NW2d __ (Docket No. 152916, decided July 17, 2017), slip op at 12.[1]

Confere was charged with having digitally penetrated the complainant's vagina. His defense was that it never happened. In opening statement, Confere's counsel explained: "But, what the big dispute here is whether or not my client did the act that we are here for, whether or not he penetrated her with his finger. And Mr. Confere absolutely unequivocally denies this." Neither "mistake" nor "accident" were "within the range of litigated matters in controversy" in this case, rendering "mistake" or "accident" irrelevant considerations and invalid grounds for admission of the other acts evidence. *People v Sabin*, 463 Mich 43, 69; 614 NW2d 888 (2000).

The second basis for admission, that the evidence demonstrates a scheme or plan, cannot withstand even cursory scrutiny. The prosecution argued that Confere engaged in a common system of making unwanted sexual contact with women with disabilities, all of whom had limited capacity to stop him. According to the prosecution, the fact that Confere had engaged in three unwanted sexual acts with two physically disabled women gives rise to a scheme or plan, opening the evidentiary door to this evidence. In my view, this argument improperly conflated propensity evidence—that Confere enjoyed assaulting incapacitated women—with the notion had Confere had a "scheme" or "system" for assaulting women with disabilities. Missing is any evidence that Confere employed any actual method, plan or scheme to achieve the molestations. And where there is no method, plan or scheme, there is only propensity.

Demonstration of a probative fact other than propensity is critical to the admissibility of other acts evidence. "Woven inextricably into the fabric of our jurisprudence is the principle that 'we try cases, rather than persons . . . .' " *Denson*, slip op at 10 (citation omitted, alteration in original). Absent an *intermediate*, nonpropensity inference (here, that the defendant had formed a common scheme or plan), other acts evidence "bears only on propensity and is inadmissible." *VanderVliet*, 444 Mich at 87. The other acts introduced in this case were so markedly dissimilar to the charged offense that they could not possibly represent a common plan or scheme. And as the prosecutor's closing argument so clearly reveals, her "plan, scheme or system" claim was really just a ruse to justify a propensity-driven case.

A "plan" or "scheme" may involve connected transactions or events, where "the charged and uncharged acts are constituent parts of a plan in which each act is a piece of the larger plan." *Sabin*, 463 Mich at 63. The three assaults introduced here do not meet that standard, as they were far removed in time from the charged conduct, and no evidence suggests that they were part of a greater enterprise or Confere's object was to achieve some overarching goal. Alternatively, other acts evidence may be admissible when "the uncharged misconduct and the charged offense are sufficiently similar to support an inference that they are *manifestations* of a common plan, scheme, or system." *Id*. (emphasis added). Central to this method of admission is the intermediate inference of a common system of doing an act:

---

[1] The second prong of the *VanderVliet* test is that the evidence is "relevant under [MRE] 402 as enforced through Rule 104(b)." *VanderVliet*, 444 Mich at 55.

The jury in not required to draw an inference regarding the defendant's character. Rather, the jury is asked to infer the existence of a common system and consider evidence that the defendant used that system in committing the charged act as proof that the charged act occurred. The logical relevance of the evidence is based on the system, as shown through the similarities between the charged and uncharged acts, rather than on defendant's character, as shown by the uncharged act. [*Id*. at 64 n 10.]

Mere similarity between the other acts and the charged misconduct is not sufficient. Rather, " 'the effort is to establish a definite prior design or system which included the doing of the act charged as part of its consummation.' " *Id*. at 64, quoting 2 Wigmore Evidence (Chadbourn rev), § 304, p 249. " 'The added element, then, must be, not merely a similarity in the results, but such a concurrence of common features *that the various acts are naturally to be explained as caused by a general plan of which they are the individual manifestations.*' " *Id*. (emphasis in original). Further, it bears emphasis that "[t]he existence of a plan in a given situation does not depend on any trait of the person's moral character." Leonard, *The New Wigmore, A Treatise on Evidence*: *Evidence of Other Misconduct and Similar Events*, § 9.2.1, p 564.

The charged offense in this case is that Confere sexually assaulted an incapacitated victim, violating MCL 750.520(d)(1)(c). The test for admissibility was whether the proposed other acts evidence demonstrated that Confere devised a common plan and used it repeatedly to perpetrate separate but similar crimes. General similarity or vague resemblance is not enough; "common features" are required. I find no concurrence of common features in the other acts brought to the jury's attention.

The first assault was committed against a 14-year-old girl in 1986; Confere was a maintenance man in the girl's apartment building. According to the witness, Confere touched her breast and between her legs, over her clothes.[2] The second assault, committed in 2004, involved an adult woman; Confere touched her breast over her clothes. In 2010, Confere assaulted the same woman; he "pushed himself" into her apartment, pinned her against the wall, and touched her breast. Here, Confere and the complainant were friends who frequently watched movies together. She allowed him to rub her feet, and on the evening in question he tried to move his hand up her thigh. Although the complainant told Confere to leave, he remained in her apartment after she fell asleep. She testified that she awoke when she felt Confere's fingers inside her vaginal area.

---

[2] In *Denson*, slip op at 19 n 11, the Supreme Court considered and rejected even fresher other acts evidence, observing: "In addition to the lack of similarity, we note that the other act in this case was remote in time, occurring approximately 10 years before the charged offense, which further limits its logical relevance."

The victims' ages differed widely, Confere's relationships to the victims differed, and the conduct at issue differed. In the case 30 years ago, Confere entered the victim's apartment to perform some maintenance task. Although he knew the second victim, they had no other relationship. None of the other victims were penetrated, and none were unconscious. Other than the fact that Confere sexually assaulted each victim, the events bear no resemblance to a common scheme or plan. Rather, the sole inference created by the other acts evidence was this: Mr. Confere had a propensity to attack incapacitated women, therefore he acted in conformity with that propensity by assaulting the complainant. This is precisely the inference that is forbidden under MRE 404(b). On retrial, I believe the other acts evidence must be excluded.

## II. PROSECUTORIAL MISCONDUCT

The prosecutor's use of the other acts evidence during her closing argument verifies that the true purpose of the evidence was to prove that "he did it before, therefore he did it this time." The majority opinion convincingly explains that Confere's character was the centerpiece of the prosecutor's argument, and that the intentional nature of the prosecutor's misconduct warrants reversal. As the Supreme Court pointed out in *Denson*, slip op at 10 (citation omitted, alteration in original), "the very danger of other-acts evidence 'is not that it is irrelevant, but, to the contrary, that using bad acts evidence can weigh too much with the jury and . . . so persuade them as to prejudge one with a bad general record and deny him a fair opportunity to defend against a particular charge.' " When cases "turn on the relative credibilities of the defendant and the prosecuting witness . . . a strict adherence to the rules of evidence and appropriate prosecutorial conduct is required to ensure a fair trial." *Martin v Parker*, 11 F3d 613, 616-617 (CA 6, 1993). The improper use of propensity evidence in this case eliminated any chance that Confere's denial would be fairly and rationally considered in light of the admissible evidence.

I write separately to address a different issue: the use of the term "prosecutorial error," which has found its way into other opinions issued by this Court. In obiter dictum, a panel of this Court recently expressed the view that the term "prosecutorial error" more accurately describes "the vast majority of cases" in which "the conduct about which a defendant complains is premised on the contention that the prosecutor made a technical or inadvertent error at trial." *People v Cooper*, 309 Mich App 74, 88; 867 NW2d 452 (2015). I disagree with any change of nomenclature. In my view, a new term is unnecessary and its use ill-advised.

There is no empiric support for *Cooper*'s underlying assumption—that "the vast majority of cases" alleging prosecutorial misconduct actually involve only "technical or inadvertent error at trial." Certainly *Cooper* cites none, and the caselaw reveals the opposite to be true. Many varieties of alleged prosecutorial misconduct regularly reviewed in this Court arise from conduct far more serious than "technical or inadvertent error at trial." For example, "[a] prosecutor's failure to disclose exculpatory evidence is the most frequent abuse of prosecutorial power." Caldwell, *The Prosecutor Prince: Misconduct, Accountability, and a Modest Proposal*, 63 Cath U L Rev 51, 60 (2013). Violations of the disclosure requirements set forth in *Brady v Maryland*, 373 US 83; 83 S Ct 1194; 10 L Ed 2d 215 (1963), may be intentional or inadvertent, but withholding evidence constitutes misconduct nonetheless:

> The government is held responsible for evidence within its control, even evidence unknown to the prosecution, *Kyles v Whitley*, 514 US 419, 437; 115 S Ct 1555;

131 L Ed 2d 490 (1995), without regard to the prosecution's good or bad faith, *United States v Agurs*, 427 US 97, 110; 96 S Ct 2392; 49 L Ed 2d 342 (1976) ("If the suppression of evidence results in constitutional error, it is because of the character of the evidence, not the character of the prosecutor."). [*People v Chenault*, 495 Mich 142, 150; 845 NW2d 731 (2014).]

Other forms of prosecutorial misconduct frequently raised in this Court involve improper witness examinations (bolstering, the introduction of inadmissible evidence, the use of material outside the record in closing argument, and the improper use of character evidence, as here), the use of perjured testimony, impugning defense counsel, and disparaging defense witnesses. See *People v Richardson*, 489 Mich 940; 798 NW2d 13 (2011). Most of the allegations involve far more than "technical" mistakes. Indeed, it is not unusual for this Court to find misconduct, but to deny relief.

In addition to the absence of any factual foundation for *Cooper*'s central tenet,[3] I see no benefit to the administration of justice in creating a paradigm that would require courts to distinguish between various degrees of prosecutorial misconduct. Our caselaw usually describes in considerable detail the conduct at issue; innocuous or "technical" mistakes simply do not rise to the level required for relief. In those cases, the Court simply states, "the prosecutor did not commit misconduct." *People v Roscoe*, 303 Mich App 633, 649; 846 NW2d 402 (2014). Although it may hurt a prosecutor's feelings to have been unjustly *accused* of "misconduct," that's a slim reed on which to support a sea change in long-accepted legal parlance. See also *State v Maluia*, 107 Haw 20, 26; 108 P3d 974 (2005) ("[W]e believe that separate nomenclature for different types of prosecutorial misconduct would lead to protracted litigation over semantics; this would place an additional burden on our courts with no corresponding benefit."). Until this Court is presented with data supporting *Cooper*'s thesis, I believe that the term "prosecutorial misconduct" should apply.

In the case before us, it bears emphasis that the conduct at issue was not "error." The prosecutor deliberately constructed a cross-examination and a corresponding closing argument that featured Confere's character and his propensity to commit sexual assaults. She knew or should have known that her words crossed the line; MRE 404(b)'s prohibition of the use of "bad character" to prove conduct is fundamental. The prejudice that she injected encouraged the jury to convict Confere because was not a "perfect gentleman" and had assaulted other women. The

---

[3] The legal literature reflects that some scholars have studied prosecutorial misconduct caselaw, and their work product supplies helpful information regarding the nature of the claims made in "the vast majority of cases." For example, Professor Paul J. Speigelman reviewed 45 federal court of appeals reversals in cases alleging prosecutorial misconduct during a 10-year period. Professor Speigelman found that 28 of the 45 opinions "use language suggesting that the prosecutor knew that the conduct was improper; in thirteen other opinions the conduct was such that the prosecutor knew or should have known it was wrong." Speigelman, *Prosecutorial Misconduct in Closing Argument: The Role of Intent in Appellate Review*, 1 J App Prac & Proc 115, 118 (1999).

"bad character" theme "pervaded the closing argument and rebuttal," *Washington v Hofbauer*, 228 F3d 689, 700 (CA 6, 2000), and the majority correctly finds that the prosecutor's improper argument seriously compromised the fairness and integrity of the proceedings.


/s/ Elizabeth L. Gleicher